NEWHALL CHAIN FORGE AND IRON CO. v. WILLIAM J. OLIVER MANUFACTURING COMPANY, et al.

Eastern Section.   September 3, 1927.

Washburn & Hyman, of Knoxville, for appellant.
Frantz, McConnell & Seymour, for appellee.

PORTRUM, J.   The Newhall Chain Forge and Iron Company filed a general creditors' bill against the William J. Oliver Manufacturing Company, in the year 1920, which was sustained as such, and the affairs of the Manufacturing Company were wound up in the proceeding; James G. Crumbliss having been appointed, and qualified, as the receiver of the property of the Manufacturing Company.   But pending a final disposition of the manufacturing plant in the hands of the receiver, the Chancellor ordered the plant to be operated so that it might be sold as a going concern.   This order permitted the receiver to do certain repair work to machinery, and other like work, as was being done before the Company was declared insolvent.   The work was only limited to a certain sum authorized, without a further order from the court.   Now, it was while the re-

ceiver was operating the plant in this manner that Costello Brothers, a firm engaged in contract work, and using as a part of its equipment steam shovels and the like, applied to Mr. Crumbliss, the receiver, for the repair of one of Costello's steam shovels, or, as Mr. Crumbliss insists, to be permitted to store one of their steam shovels upon the yards of the Oliver Manufacturing Company's plant. Due to the conversation between Mr. Costello and Mr. Crumbliss a steam shovel was shipped from Oneida, Tennessee, where it had been engaged in grading, to the yards of the manufacturing plant in Knoxville. The steam shovel proper is placed on its own wheels and is transported over the railroad as other cars, but the boom, to which is attached the shovel, is a strong piece of structural steel, and it was necessary that this, together with the dipper, be shipped on another car, and it was shipped on a flat car in the same train with the shovel. The shovel and the boom arrived upon the Oliver yards, and the shovel was left standing in one part of the yard, the boom was carried about forty feet away and was unloaded from the flat car by a derrick belonging to the Oliver Manufacturing Company, and was thrown upon the ground, where it laid until the weeds grew up around it obscuring it from view. It was permitted to lie upon the ground where it was unloaded for about eighteen months, and during this time the plant of the Oliver Manufacturing Company had been sold for $100,000, and the receiver was ordered to sell the odds and ends, or junk, from the premises, cleaning up all the property subject to administration in the courts. Now, in obedience to this order, the receiver advertised in the papers and posters that he would sell the odds and ends, which are too numerous to here mention, at the plant of the company. He did sell all the scrap iron upon the premises, junk dealers being his purchasers. He knew that other parties had property upon the premises, and he issued a circular letter to them to come and mark their property so that it would not be sold. Costello says that he did not receive this notice. At the appointed time the sale was made and the junk dealers immediately set to work to cut up and remove the heavy steel from the premises. When they came to the Costello boom, it was lying in the abandoned place, covered with a thick coat of rust and the weeds growing around it almost obstructing the view. The junk dealer fell upon it with his electric torches and cut it up by first cutting it lengthwise and then across. He also knocked certain fixtures off of the bucket, including the teeth. Mr. Costello was notified of the sale at the time the junk dealers were engaged in removing the property. He then went immediately to the yard and found the junk dealer cutting up his boom, and they had then removed a part of it. He then went in search of those portions that had been removed and found some upon cars to be shipped and some

in other places. He gathered them all together and piled them up upon the yard where they are now.

After the loss of the boom Costello Brothers filed their petition in the case of Newhall Chain Forge and Iron Company v. William J. Oliver Manufacturing Company, setting out the facts and seeking a recovery for the value of the boom against the receiver and his bondsmen. They were permitted to file a petition, and after the proof was taken the case made upon the petition was heard and the Chancellor was of the opinion that Costello Brothers were only permitted by the receiver to store the shovel upon the yards without charge, and the receiver was not authorized under the order of the court to receive property for storage without compensation, and it being a gratuitous bailment, there was no liability shown, and the petition was dismissed.

The first controverted question is, did Crumbliss receive the shovel to do repair work upon it, or did he hold it in storage as an accommodation only. The facts as presented by Costello are—he says, he met Mr. Crumbliss on the street in front of the Sterling-Crumbliss hardware store, in the presence of Mr. Ralph Oliver, and that he then asked Crumbliss if he could ship the shovel to the yards and have it repaired by boring out the rivets and welding new but larger rivets in, and that Crumbliss told him he would do the repair work and ship it in. Mr. Ralph Oliver states that he was present and introduced Costello to Crumbliss and that Crumbliss promised to do the repair work as detailed by Costello. Mr. Crumbliss denied this, but says that he saw Mr. Costello near the Holston National Bank, while he was in the presence of Judge McKinney Barton and another, and that Mr. Costello requested him to allow him to ship the steam shovel to the yards for storage. This was the only proof taken upon this question, and it is seen the preponderance is in favor of Mr. Costello, but in Mr. Costello's deposition he says that in answering a call of Mr. Crumbliss he went to the yards of the Oliver Manufacturing Company to meet other contractors called there for the purpose of discussing the organization of a company to take over the Oliver plant and do repair work of this character, as well as other work. There was nothing definitely done at this meeting, but it was understood that a company would be promoted, and he said it was agreed the steam shovel should remain and the boom should be the first work done by the company. When this agreement was made, if the receiver was a bailee for hire, he ceased then to be one, and thereafter held the shovel awaiting the organization of the new company and not in the interest of a receivership. For this reason we concur with the holding of the Chancellor that Crumbliss was a gratuitous bailee, and not a bailee for hire.

But the controlling question in this law suit is, did Crumbliss convert the steel boom when he sold the same to the junk dealers, or did he sell the same to the junk dealers. A gratuitous bailee cannot convert the property to his own use. And if what Mr. Crumbliss did in this instance, or failed to do, did not amount to a conversion, then he is not liable, because the property was of such a character he owed no duty to the bailor. To exercise any degree of care other than that he did exercise, if what he failed to do, together with what he did, does not amount in law to a conversion. If he did not convert the property, then the junk dealers did, and under the circumstances he would be excused from delivering it back to the bailor.

But did the junk dealer convert it? He went upon the ground, took it in possession and was proceeding to cut it up, when he was stopped, and when he did stop and turn it back to the rightful owner, he was acting under a claim of right as he thought. He had purchased from Mr. Crumbliss the junk on the ground, this property was not designated or set apart from the other junk, and the junk included two more steel booms, this was covered with rust a quarter of an inch thick, and had twenty cracks in it, ten of which had been repaired. The boom had the appearance of being abandoned. Mr. Crumbliss knew the boom was on the ground prior to his sale, for before that he had told the owner to mark it; a bill for the unloading of the boom had been sent by Crumbliss to Costello. He made no attempt to segregate Costello's property from the property he was selling of a like character. Under these circumstances we think the junk dealer did not convert the boom, but that he was justifiable in believing the same passed to him under his purchase. Had Mr. Crumbliss exercised a small degree of care, not to say ordinary care, he would have set apart the property he knew to belong to another before selling in a blanket form all the junk upon the yards. It may be true that he had written Costello, and Costello insists he did not receive the letter, yet, his duty was not over there, it was his further duty to see that his act in selling the property upon the yards did not include the property of Costello, when at the time he knew of the presence of Costello's boom. Of course now if these acts were not negligent, and he had a right to turn the junk dealers in on the yard, with authority to cut up junk, knowing of the existence of the boom, then he owed Costello no other duty, because the property was of such a kind it was not necessary to guard, and there would be no liability. We think the act of Crumbliss, under the circumstances detailed, was a conversion of the property, but Costello reclaimed the property in its damaged condition, and his measure of damage would be the injury to his boom. But assuming that he was entitled to recover full value for the boom in its

then condition we cannot agree with counsel that he is entitled to recover the price of a new boom, or $5200. The steam shovel in question was purchased in 1912, and had been in use twelve years. We cannot agree that this character of machinery never wears out, and is continually rejuvenated by the replacement of worn parts, and, following this line of argument, give Costello a new boom. A steam shovel twelve years old must have a market value different from its original cost price. Therefore, when counsel confine themselves solely to proof of replacement by a new boom as their measure of damage, they find themselves without proof of the actual measure of damages, which is the price of a secondhand, well rusted, and muchly fractured steel boom. Mr. Costello declined to testify to the value of the boom, as it was at the time of the damage, and so did each of his witnesses, who are contractors. Their excuse for not doing so is not convincing, and is not such as will entitle the petitioners to a brand-new boom. It is not competent to say that by spending $300 or $400 on the old boom it would then be practically as good as a new boom, the question was, what was the value of the old boom at the time of the damage? Due to the hesitancy of these contractors who were testifying in fixing a value to the old boom, this court is persuaded that probably the old boom was in fact practically valueless, if it had to be sold upon the market. If these contractors are unable to value it, certainly the court will not run the risk of putting an excessive value upon the secondhand boom.

The defendant's witnesses testify that by welding the boom it can be restored to practically the same strength, and that this will cost from $150 to $200. The petitioner's witnesses say this cannot be done, but we are unable to see why, because it is shown the boom was repeatedly cracking and being repaired, and it was shown to have ten cracks that had been repaired and ten others at the time of the injury. It seems that if the boom were properly welded it should be stronger at the place of welding than at other places. The fact that it can be repaired is borne out by the conduct of Mr. Costello. If it could not, why did he gather up all of the parts and store them upon the ground? If it can be welded, then it can be restored as a used boom. We can find no evidence in the record which would justify granting any recovery except the testimony of the welders, who say it can be done for $150 to $200. If we disregard this evidence, then there is no evidence of the value of the boom in its then condition, and the petitioner is not entitled to the value of a new boom. The petitioner had ample opportunity to prove by the contractors the value of the boom at the time of the injury. Each of them declined to fix its value, and Mr. Costello did not fix its value. In view of these facts, the court has a serious doubt as to the real value of this property, the petitioner should have developed

his case in the lower court, and for these reasons we will not remand the case for further proof, but will grant a recovery only for the amount above shown, or the sum of $200, and the cost of the cause.

Snodgrass and Thompson, JJ., concur.